CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
07/22/2020
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | |
|---|---|
| SHARON H.,[1] <br>     Plaintiff, <br> <br> v. <br> <br> ANDREW M. SAUL,[2] <br> Commissioner of Social Security, <br>     Defendant. | Civil Action No. 3:18-cv-00111 <br> <br> REPORT & RECOMMENDATION <br> <br> By:   Joel C. Hoppe <br>         United States Magistrate Judge |

Plaintiff Sharon H. asks this Court to review the Commissioner of Social Security's final decision denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' briefs, and the applicable law, I cannot find that the Commissioner's final decision is supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the case under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Commissioner Saul is hereby substituted for Nancy A. Berryhill, former Acting Commissioner of Social Security, as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her

2

residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[3] The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

In June 2013, Sharon filed for DIB alleging that she was disabled because of anxiety, post-traumatic stress disorder, attention deficit disorder, and recurring mouth sores. *See* Administrative Record ("R.") 111, 141–43, 232–34, 275, ECF No. 5. Sharon was forty years old, or a "younger person" under the regulations, when she allegedly became disabled on May 1, 2013. R. 111; 20 C.F.R. § 404.1563(c). Disability Determination Services ("DDS"), the state agency, denied her claim initially in March 2014, R. 110–23, and upon reconsideration that November, R. 124–40. On January 11, 2017, Sharon appeared with counsel and testified at an administrative hearing before ALJ Andrew Emerson. *See* R. 59–109. A vocational expert ("VE") also testified at this hearing. R. 103–07.

ALJ Emerson issued an unfavorable decision on March 17, 2017. R. 44–53. He first found that Sharon met the Act's insured-status requirements "at all times relevant" to his decision, R. 46, which he later defined as May 1, 2013, through March 17, 2017, *see* R. 53. He also found that Sharon engaged in substantial gainful activity ("SGA") during the fourth quarter of 2015, and that Sharon's earnings from other work attempts during the relevant time did not exceed SGA levels. *See* R. 46 (citing R. 254–57, 258–60). At step two, ALJ Emerson found that

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

Sharon "had the following severe impairments: anxiety disorder/post-traumatic stress disorder (PTSD), borderline personality disorder, histrionic personality disorder, attention deficit disorder (ADD), major depressive disorder, and adjustment disorder." *Id.* Her physical conditions, including recurrent mouth ulcers, were non-severe impairments because they responded to minimal treatment and "did not exist for a continuous period of at least 12 months." R. 47. Sharon's severe mental impairments did not meet or medically equal the relevant Listings, *id.* (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04, 12.06, 12.07, 12.08, 12.11, 12.15), because she had only "mild limitations" understanding, remembering, or applying information, *id.* (citing R. 298, 542, 583, 730, 764, 779), and "moderate limitations" interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself, R. 47–48 (citing R. 297–302, 395, 397, 544, 565, 581, 583, 706, 726, 730–31, 741, 754, 764, 769, 775, 779, 784).

ALJ Emerson then evaluated Sharon's residual functional capacity ("RFC") and found that she could work at any exertional level, but was limited to "simple, routine, repetitive tasks in a low stress work environment[,] with low stress defined as no strict production quotas," and could "only occasionally interact with coworkers, supervisors, and the general public." R. 49. The limitations to unskilled work with occasional social interaction ruled out Sharon's return to her past work as a nursing assistant, office or data-entry clerk, typist, receptionist, fast-food worker, and cashier. R. 52. Finally, based on his RFC finding and the VE's testimony, ALJ Emerson concluded that Sharon was not disabled at any time between May 1, 2013, and March 17, 2017, because she could perform certain unskilled occupations (document preparer, check weigher, laundry folder) that offered a significant number of jobs in the national economy. R. 52–53; *see* R. 105–06. The Appeals Council denied Sharon's request to review ALJ Emerson's

4

decision, R. 8–12, and this appeal followed.

### III. Discussion

Sharon's arguments challenge different aspects of ALJ Emerson's RFC determination. *See* Pl.'s Br. 4–5 (incorrect time period), 8–9 (failure to include RFC limitation reflecting "moderate" difficulties maintaining concentration, persistence, or pace), 9–12 (failure to explain "strict production quotas" limitation), 12–13 (failure to consider abnormal mental-status exam findings), 13 (failure to explain weight assigned to medical opinions), ECF No. 10. Most of her objections are persuasive.[4]

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite her medical impairments and symptoms.[5] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). Second, the ALJ's decision must provide a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and

---

[4] Sharon's first objection, that ALJ Emerson failed to consider the correct period at issue (May 1, 2013– March 17, 2017) because he mistakenly found that her insured status expired on March 31, 2016, Pl.'s Br. 4 (citing R. 44), is not persuasive. I agree with the Commissioner that the initial reference to March 31, 2016, appears to be a typographical error, and that ALJ Emerson correctly defined the "period at issue" as May 1, 2013, through the date of his decision. Def.'s Br. 12–13 (citing R. 46–47, 53), ECF No. 18.

[5] "Symptoms" are the claimant's own description of her medical impairment. 20 C.F.R. § 404.1502(i).

logically explaining how he weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Thus, a proper RFC analysis has three components: (1) all relevant evidence considered under the correct legal standard, (2) an accurate and logical explanation how the evidence supports the ALJ's findings, and (3) conclusion. *See Thomas*, 916 F.3d at 311; *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017). "The second component, the ALJ's logical explanation, is just as important as the other two. Indeed, [binding] precedent makes clear that meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Thomas*, 916 F.3d at 311 (citing *Woods*, 888 F.3d at 694). A reviewing court that "cannot gauge the propriety of the ALJ's RFC assessment" typically "cannot say that substantial evidence supports the ALJ's denial of benefits." *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663–63 (4th Cir. 2017).

ALJ Emerson's RFC analysis contains several legal errors that require reversal and remand under this standard. First, he did not explain his finding that Sharon could perform unskilled tasks "in a low stress work environment with low stress defined as no strict production quotas." R. 49. "'Unskilled work' is a term of art, defined by regulation as 'work [that] needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 F. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). "But no analogous regulatory definition exists," *Perry v. Berryhill*, 765 F. App'x 869, 872 (4th Cir. 2019), for the terms "low stress" and "no strict production quotas" that ALJ Emerson used in his RFC finding, R. 49. *See, e.g.*, R. 53 ("The [VE] testified that the DOT does not address the limitation to low stress work."); *Nakia Tanisha W. v. Saul*, No. TMD 19-1134, 2020 WL 2198092, at *1, *5 (D. Md. May 5, 2020) (remanding where ALJ failed to explain

6

RFC limiting claimant to "a low stress environment, defined as no strict production quotas" because the term "no strict production quotas" was not explained in the administrative record or defined in any regulatory authority). The DDS psychologists did not mention "strict production quotas" or any similar terms in their medical opinions, *see* R. 116, 119–21, 135–37, and ALJ Emerson's decision provided no explanation about what this limitation meant, how he chose it, or why it reflected Sharon's actual response to the demands of work.[6] *See Perry*, 765 F. App'x at 872; *Thomas*, 916 F.3d at 312; *Woods*, 888 F.3d at 694.

ALJ Emerson also did not explain what he meant by "low stress defined as no strict production quotas," R. 105, when he asked the VE about the occupational prospects for a person limited to "simple, routine, and repetitive tasks in a low stress work environment" and only occasional interaction with the public, co-workers, and supervisors, *see* R. 105–06. The fact that the VE's "testimony was based on her experience," Def.'s Br. 21–22, sheds no light on how she interpreted the terms "low stress" and "no strict production quotas," R. 106, let alone whether she understood the specific limitations the ALJ meant to convey in his hypothetical question. *See Walker v. Bowen*, 889 F.2d 47, 51 (4th Cir. 1989). All ALJ Emerson's colloquy with the VE shows is that the VE thought document preparers, laundry folders, and "check weighers"[7] did not

---

[6] The Commissioner's rules instruct that because "reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances," claimants with severe mental impairments "may have difficulty meeting the requirements of even so-called 'low-stress' jobs." SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985). Individuals "may cease to function effectively when facing such demands as getting to work regularly" or staying at work for a full day, being supervised or having their work judged, interacting with familiar or unfamiliar people, performing at an acceptable pace without making mistakes, following instructions, or paying attention to detail. *Id.* The ALJ's RFC assessment reflect a thorough, individualized evaluation of the claimant's actual response to the demands of work and account for any impairment-related limitations supported by the record. *Id.*

[7] This job involves weighing individual cups of explosive or ammunition powder charge to ascertain their adherence to specifications, returning inexact weights to a coworker to be check-weighed for a third time, and passing satisfactory charges on to another coworker. DOT No. 737.687-26, 1991 WL 680047.

7

have to meet "strict production quotas":

> [ALJ]: [H]as all of your testimony today been according to the <u>Dictionary of Occupational Titles</u>?
>
> [VE]:   It has, Your Honor. I would like to point out that low stress is not specifically addressed by the DOT. And, therefore, that part of my testimony is based on my experience and training.
>
> Q:   Does the qualifier, no strict production quotas, does that -- how did you assess that as far as finding jobs?
>
> A:   Your Honor, if I run into how you qualified it being no interaction with co-workers and no production --
>
> Q:   No. Yeah, no strict production quotas.
>
> A:   No strict production quotas, Your Honor, with any of those three positions, no.

R. 106. ALJ Emerson relied on the VE's testimony in finding that Sharon could work as a laundry folder, document preparer, or check weigher, R. 52–53, all three of which "presumably require an employee to produce a certain amount of work in a particular time frame," *Lisa G. v. Saul*, No. 7:18cv39, 2019 WL 4148173, at *4 (W.D. Va. Aug. 30, 2019), whether it be pieces of laundry folded, individual documents prepared, or cups of powder charge weighed and passed on to a coworker. "Without an explanation of the term 'strict production quotas' from the ALJ, it is impossible to determine whether substantial evidence supports the ALJ's determination that [Sharon] can do the jobs listed and thus is not disabled." *Lisa G.*, 2019 WL 4148173, at *4.

"The missing explanation in this case is particularly important because it is undisputed," *Perry*, 765 F. App'x at 872, that Sharon's severe mental impairments "moderate[ly]" limited her overall ability to maintain concentration, persistence, and pace, R. 47–48; *see* R. 51, 117, 119–20, 133, 135–36. Under *Mascio v. Colvin*, ALJ Emerson's RFC determination had to either account for this deficit or adequately explain why, notwithstanding his earlier finding, Sharon's overall limitations did "not affect [her] capacity to sustain simple, routine, or unskilled work." *Perdue v. Colvin*, No. 7:14cv173, 2015 WL 5771813, at *6 (W.D. Va. Sept. 30, 2015) (citing

8

*Mascio*, 780 F.3d 623, 638 (4th Cir. 2015)). ALJ Emerson stated that he "accounted for" Sharon's "impaired concentration" by limiting her "to simple, repetitive job tasks in a low stress environment," and noted that those restrictions were consistent with the DDS psychologists' medical opinions and the "generally normal findings" on Sharon's mental-status exams. R. 51; *see* Def.'s Br. 15. But he did not actually *explain* how he concluded, based on this evidence, that these limitations accounted for Sharon's moderate problems with concentration, persistence, and pace. *Woods*, 888 F.3d at 694.

ALJ Emerson could not adequately account for Sharon's limitations merely by restricting her "to simple, routine tasks or unskilled work." *Mascio*, 780 F.3d at 638. The Commissioner asserts that ALJ Emerson filled this gap by limiting Sharon to "a low stress work environment," R. 51, where "low stress is defined as no strict production quotas," R. 49. *See* Def.'s Br. 17; *Perry*, F. App'x at 872. That may be true. "But, again, [I] do not know what the ALJ intended when []he used that phrase." *Perry*, F. App'x at 872. This lack of explanation "makes it difficult, if not impossible," *Thomas*, 916 F.3d at 312, to determine whether the limitation "properly accounted" for Sharon's difficulties "maintaining concentration, persistence, and pace," *Perry*, 765 F. App'x at 872.

Finally, ALJ Emerson did not explain how he "weighed significant evidence related to [Sharon's] mental-health treatment," *Thomas*, 916 F.3d at 312, including medical opinions suggesting Sharon's depression, anxiety, personality disorders, and adjustment disorders were more functionally limiting than he found. The ALJ cited treatment records dated between March 2014 and August 2016 to support his conclusion that Sharon had "generally normal mental status examinations" during that time. R. 50 (citing R. 394–99, 543, 567, 575, 741, 750, 771). The records he chose to summarize did show that Sharon had intact memory, R. 47, 50 (citing R. 543,

9

567, 575); "exhibited no thought disorder, hallucinations, delusions," R. 50–51 (citing R. 396–97, 543); and generally presented as "friendly," "pleasant," or "cooperative," R. 50 (citing R. 543, 771). *See also* R. 725–27, 730–34, 736, 739, 741–69, 771–87. But, they also showed that Sharon "often" had a depressed, anxious, or "angry/hostile" mood and affect, exhibited impaired concentration, R. 50, tended to "shut down or lash out" under stress, and had "problems stopping speaking and listening to others," R. 48 (citing R. 397). *See also* R. 727, 730–31, 735, 740, 743, 745–47, 754, 757–58, 760, 762, 764, 766, 768–69, 770–73, 775–77, 779–83, 785–88. ALJ Emerson implicitly recognized that Sharon's mental exams contained both abnormal and unremarkable findings, but he did not explain how he considered and resolved those conflicts in concluding that Sharon's exams were "generally normal," R. 51. *See Thomas*, 916 F.3d at 321.

ALJ Emerson also overlooked other abnormal findings related to Sharon's severe psychiatric disorders, R. 46, including her treating psychologist's observations that Sharon "frequently ha[d] increased reactivity" consistent with her "usually depressed or anxious" mood and occasionally "defensive," "agitated," and "angry" presentation, *see* R. 394–97; her treating psychiatrist's opinions that Sharon understood things in "concrete" terms, R. 533, and had "some problems with flexibility" and "trouble adapting to demands of work," R. 544; and an examining psychologist's observations that Sharon "often misperceive[d] events and form[ed] mistaken impressions of people and the significance of their actions," that her thought content showed some evidence of "paranoid ideation" secondary to depression and anxiety, and that "deficits in her cognitive functioning related to correctly receiving [nonverbal] information . . . ma[de] it difficult for her to interpret social cues accurately" and interact appropriately with other people. R. 405. This information is consistent with the DDS psychologists' medical opinions that Sharon should be limited to "infrequent" or "gradual" changes in the workplace and "could accept

10

direction and constructive criticism from supervisors" if those interactions were "non-confrontational," R. 120–21, 136–37, which ALJ Emerson also did not mention in his decision. *Cf. Lewis*, 858 F.3d at 869 ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding.").

## IV. Conclusion

I take no position on whether Sharon is entitled to disability benefits for the relevant period. On remand, the Commissioner must consider and apply the applicable legal rules to all the relevant evidence in the record; explain how any material inconsistencies or ambiguities were resolved at each critical stage of the determination; and, assuming Sharon cannot prove she was disabled based on the medical evidence alone, provide a logical link between the evidence the Commissioner found credible and the RFC determination.

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** the Plaintiff's motion for summary judgment, ECF No. 9, **DENY** the Commissioner's motion for summary judgment, ECF No. 17, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** the case from the Court's active docket.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or

> recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Norman K. Moon, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to counsel of record.

ENTER: July 22, 2020

*/s/ Joel C. Hoppe*

Joel C. Hoppe
United States Magistrate Judge