# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
# CHARLOTTESVILLE DIVISION

| | |
|---|---|
| SHARON H.,[1]  *Plaintiff*,  v.  ANDREW M. SAUL, COMMISSIONER OF SOCIAL SECURITY,[2]  *Defendant*. | CASE NO. 3:18-cv-00111  MEMORANDUM OPINION & ORDER  JUDGE NORMAN K. MOON |

This matter is before the Court on the Parties' cross motions for summary judgment, Dkts. 9, 17. Pursuant to Standing Order 2011-17 and 28 U.S.C. § 636(b)(1)(B), the Court referred this matter to Magistrate Judge Joel C. Hoppe for proposed findings of fact and a recommended disposition. In his Report and Recommendation ("R&R"), Judge Hoppe determined that the Commissioner's final decision was not supported by substantial evidence and advised this Court to grant Sharon's motion, deny the Commissioner's motion, reverse the decision, and remand the case to the Commissioner for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g). Dkt. 19. The Commissioner timely filed his objections, Dkt. 22, obligating the Court to undertake a *de novo* review of the R&R. *See* 28 U.S.C. § 636(b)(1)(C); *Farmer v. McBride*, 177 F. App'x 327, 330 (4th Cir. 2006). The Court finds that the Commissioner's objections do not have merit and adopts Judge Hoppe's R&R in full.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts refer to claimants only by their first names and last initials.

[2] Because Andrew M. Saul became Commissioner of Social Security in June 2019, Commissioner Saul is hereby substituted for the former Acting Commissioner, Nancy A. Berryhill, as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

**STANDARD OF REVIEW**

Objections to a magistrate judge's report and recommendation under Federal Rule of Civil Procedure 72(b) "train[] the attention of both the district court and the court of appeals upon only those issues that remain in dispute after the magistrate judge has made findings and recommendations." *United States v. Midgette*, 478 F.3d 616, 621 (4th Cir. 2007) (citing *Thomas v. Arn*, 474 U.S. 140, 147–48 (1985)). The district court must determine *de novo* any portion of the magistrate judge's report and recommendation to which a proper objection has been made. Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C); *Farmer*, 177 F. App'x at 330–31.

In conducting this review, this Court must affirm the Administrative Law Judge's ("ALJ") factual findings if they are supported by substantial evidence and were reached through application of the correct legal standard. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019); *Bird v. Comm'r of Soc. Sec.*, 669 F.3d 337, 340 (4th Cir. 2012). Under this standard of review, the Court must "look[] to an existing administrative record and ask[] whether it contains 'sufficien[t] evidence' to support the [ALJ's] factual determinations." *Biestek*, 139 S. Ct. at 1154 (internal citations omitted). Substantial evidence requires more than a mere scintilla—but less than a preponderance—of evidence. *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001). A finding is supported by substantial evidence if it is based on "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). Where "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," the Court must defer to the ALJ's decision. *Id*. A reviewing court may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of the ALJ. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal citations omitted). "Ultimately, it is the duty of the [ALJ] reviewing a case, and not the

responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, even if the Court would have made contrary determinations of fact, it must nonetheless uphold the ALJ's decision, so long as it is supported by substantial evidence. *See Whiten v. Finch*, 437 F.2d 73, 74 (4th Cir. 1971).

## ANALYSIS

In June 2013, Sharon filed a claim for Disability Insurance Benefits ("DIB") alleging a disability based on anxiety, post-traumatic stress disorder, attention deficit disorder, and recurring mouth sores beginning on May 1, 2013. Administrative Record ("R.") 111, 141–43, 232–34, 275. In March 2014 and again on reconsideration in November 2014, the Social Security Administration denied her claim. R. 110–40. Sharon requested an administrative hearing and appeared before Administrative Law Judge Andrew Emerson ("the ALJ") on January 11, 2017. R. 59–109. On March 17, 2017, the ALJ concluded that Sharon is not disabled. R. 44–53. Sharon requested that the Appeals Council review the ALJ's decision, but the Appeals Council denied her request for review. R. 8–12.

To determine whether Sharon was disabled, the ALJ was required to work through a five-step framework, considering, in sequence, whether Sharon (1) was working; (2) had a severe medical impairment that met the Social Security Act's duration requirement; (3) had an impairment listed or equivalent to one listed in the Act's regulations; (4) could return to her past relevant work based on her residual functional capacity ("RFC"); and, if she could not, whether (5) she could perform other work based on her RFC. 20 C.F.R. § 404.1520(a)(4); *see Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). At step one, the ALJ found that Sharon met the Act's insured-status requirements from May 1, 2013 to March 17, 2017, R. 46, 53, and had engaged in substantial gainful activity ("SGA") during the fourth quarter of 2015 but did not meet the SGA

threshold based on her other work-related earnings during that time frame. R. 46. At step two, the ALJ found that Sharon "had the following severe impairments: anxiety disorder/post-traumatic stress disorder (PTSD), borderline personality disorder, histrionic personality disorder, attention deficit disorder (ADD), major depressive disorder, and adjustment disorder." *Id.* At step three, the ALJ found that Sharon's severe mental impairments—considered alone or all together—did not meet or medically equal the relevant listings in the Act because Sharon had only "mild limitations" understanding, remembering, or applying information and "moderate limitations" interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. R. 47–48. At step four, the ALJ assessed Sharon's RFC and found that she could work at any exertional level, but she was limited to "simple, routine, repetitive tasks in a low stress work environment[,] with low stress defined as no strict production quotas," and could "only occasionally interact with coworkers, supervisors, and the general public." R. 49. As a result of these limitations, Sharon could not return to past work as a nursing assistant, office or data-entry clerk, typist, receptionist, fast-food worker, or cashier. R. 52. However, at step five, the ALJ found that Sharon could perform certain unskilled occupations—document preparer, check weigher, laundry folder—that offered a significant number of jobs in the national economy. R. 52–53.

In the R&R, Judge Hoppe recommended a determination that the Commissioner's final decision was not supported by substantial evidence and identified three legal errors requiring reversal and remand. First, the ALJ did not explain the meaning of his finding that Sharon could perform unskilled tasks "in a low stress work environment with low stress defined as no strict production quotas." Dkt. 19 at 6–8. Second, without a clear definition of "no strict production quotas," the ALJ's finding restricting Sharon to "only simple, routine, repetitive tasks in a low stress work environment" does not adequately account for Sharon's "moderate limitations in

4

concentration, persistence, and pace." *Id.* at 8–9. Third, the ALJ did not explain how he "weighed significant evidence related to [Sharon's] mental-health treatment," *Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019), including medical opinions suggesting that Sharon's depression, anxiety, personality disorders, and adjustment disorders were more functionally limiting than he found. Dkt. 19 at 8–9.

The Commissioner objects to all three of these issues and argues (1) that the ALJ's decision sufficiently explained the RFC limitation to a "low stress work environment" with "no strict production quotas"; (2) that the ALJ's RFC assessment accounted for Sharon's moderate limitations in concentration, persistence, or pace; and (3) that the ALJ sufficiently considered the medical evidence relevant to Sharon's mental impairments. This opinion addresses each of these alleged errors in turn. For both the reasons stated below and those expressed in Judge Hoppe's R&R, the Commissioner's objections will be overruled.

1. **ALJ's Explanation of RFC Limitation to "Low Stress Work Environment" with "No Strict Production Quotas"**

In the R&R, Judge Hoppe determined that the ALJ did not explain the meaning of his RFC finding limiting Sharon to unskilled tasks "in a low stress work environment[,] with low stress defined as no strict production quotas." Dkt. 19 at 6. Specifically, the term "strict production quotas" is neither defined in any regulations nor mentioned in Sharon's evaluating psychologists' medical opinions, and the ALJ did not explain its meaning or significance in his decision or when he questioned the vocational expert during the administrative hearing. *Id.* at 6–7. *See Perry v. Berryhill*, 765 F. App'x 869, 872 (4th Cir. 2019) (remanding because ALJ failed to explain RFC limitation to "non-production oriented work setting," a term with "no . . . regulatory definition" that is neither "commonly used in . . . case law" nor "otherwise self-explanatory," because court could not evaluate whether limitation properly accounted for plaintiff's mental impairments);

5

*Thomas*, 916 F.3d at 311–12 (finding that ALJ erred by failing to explain RFC restriction to jobs that do not require "a production rate or demand pace").

In his objections to the R&R, the Commissioner asserts that the magistrate judge erred when he found that the ALJ failed to explain Sharon's RFC limitation because "strict production quota" is a "clear term" that can be "understood based on its plain language," unlike the phrases used in *Perry* ("non-production oriented work setting") and *Thomas* (no "production rate or demand pace"). Dkt. 22 at 2. *Perry* and *Thomas*, according to the Commissioner, do not require that all RFC terms be defined in a regulation or other authority but rather that the ALJ's explanation be clear enough to allow for judicial review. Contending that the ALJ met this standard, the Commissioner cites numerous places in the record where the ALJ discussed evidence relevant to Sharon's limitations in concentration, persistence, and pace—including state agency psychologists' opinions emphasizing non-stressful tasks. *Id.* at 3. The Commissioner also asserts that the Court should defer to the vocational expert's testimony about low stress jobs and no strict production quotas because that testimony was based on her experience and expertise, and the Court is not in the best position to evaluate specialized terminology. Dkt. 22 at 3–4. Finally, the Commissioner argues that the ALJ's explanation of his RFC assessment is like the one that the Fourth Circuit upheld in *Sizemore v. Berryhill*, 878 F.3d 72 (4th Cir. 2017). Dkt. 22 at 1–2. Importantly, *Sizemore* did not raise or address a challenge regarding whether the terms used in the ALJ's RFC assessment were clear enough to allow for judicial review. However, the Fourth Circuit implicitly found that it could review the assessment limiting the claimant to "work[ing] only in a low stress setting defined as non-production jobs without any fast-paced work and with no public contact." 878 F.3d at 79, 81.

While an ALJ need not articulate the RFC assessment exclusively in terms defined in regulations or other authorities, the ALJ must explain "no strict production quotas" clearly enough to allow for judicial review. *See Thomas*, 916 F.3d at 312 (finding that ALJ "did not give [the court] enough information to understand what th[e] terms ['production rate' and 'demand pace'] mean[,] . . . mak[ing] it difficult, if not impossible, for [the court] to assess whether their inclusion in [the claimant's] RFC is supported by substantial evidence"). The Court is not persuaded that the ALJ did so on this record. The plain meaning of "strict production quota"—something like "the exact, precise proportion of production assigned to each team member of a body," according to the Commissioner's brief—does not help the Court understand what the ALJ intended when he used that term. And although the ALJ gave the state agency psychologists' opinions substantial weight and characterized them as showing that Sharon "can perform simple, routine, non-stressful tasks involving minimal contact with the general public," R. 51, the ALJ did not explain how "no strict production quotas" and "non-stressful tasks" relate to each other.

The Court struggles to grasp how, as the Commissioner argues, "strict production quotas" could simultaneously be understood based on its plain meaning but also be a specialized term within the vocational field. But even if it is a specialized term among vocational experts, the Court must evaluate whether the ALJ's findings are supported by substantial evidence and thus must be able to comprehend the term's meaning. *See* 42 U.S.C. § 405(g). The vocational expert's testimony does not shed light on the term's meaning. *See* R. 106, Dkt. 19 at 7–8. In fact, as Judge Hoppe's R&R suggests, the vocational expert's testimony confuses the issue further because the vocational expert asserted—and the ALJ found—that Sharon could work as a laundry folder, document preparer, or check weigher—all jobs that "'presumably require an employee to produce a certain amount of work in a particular time frame,' . . . whether it be pieces of laundry folded, individual

7

documents prepared, or cups of powder charge weighed and passed on to a coworker." Dkt. 19 at 8 (quoting *Lisa G. v. Saul*, No. 7:18-cv-39, 2019 WL 4148173, at *4 (W.D. Va. Aug. 30, 2019)).

Nor do the other cited references to the administrative record offer additional clues about the meaning of "no strict production quotas." None of the record citations in the Commissioner's brief or the ALJ's decision contain the phrase "strict production quota," much less define it. The state agency psychologists indicated only that Sharon "would be able to complete a normal work week and to perform at a generally consistent pace with others, with only minimal need for accommodations on an infrequent basis" and that she "would do better on tasks requiring minimal contact with the general public in order to avoid stress." R. 120, 136.

Finally, this case is not like *Sizemore*. The Fourth Circuit did not address a similar challenge to the clarity of the term "non-production job" used there. And "no strict production quotas" is more comparable to the limitation to no "production rate or demand pace" that the Fourth Circuit found lacking in *Thomas*.

Ultimately, "[w]ithout an explanation of the term 'strict production quotas' from the ALJ, it is impossible to determine whether substantial evidence supports the ALJ's determination that [Sharon] can do the jobs listed and thus is not disabled." *Lisa G.*, 2019 WL 4148173, at *4. The Court finds that the ALJ's decision does not provide sufficient definitional clarity on the RFC limitation to a "low stress work environment[,] with low stress defined as no strict production quotas," and that remand is needed for the ALJ to explain the meaning of the phrase "no strict production quotas."

2. **ALJ's Accounting for Moderate Limitations in Concentration, Persistence, or Pace through RFC Limitation to "Simple, Routine, Repetitive Tasks in a Low Stress Environment"**

The Commissioner correctly notes that the ALJ need not "always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Dkt. 22 at 4 (quoting *Shinaberry v. Saul*, 952 F.3d 113, 121 (4th Cir. 2020)). But this is only true where the ALJ "'explain[s] why a claimant's moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation' in the claimant's RFC." *Shinaberry*, 952 F.3d at 121 (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015)). In assessing Sharon's RFC, then, the ALJ was required to account for Sharon's moderate limitations in concentration, persistence, or pace by either (1) articulating a specific RFC limitation or (2) explaining why those moderate mental limitations did not warrant a specific RFC limitation. *Id.*

Here, the ALJ did not explain why Sharon's moderate mental impairments do not warrant a specific RFC limitation, so he was required to articulate a specific RFC limitation to account for them instead. The ALJ asserted that he "accounted for [Sharon's] impaired concentration in the residual functional capacity above with the limitation to simple, repetitive job tasks in a low stress environment." R. 51. But the ALJ's attempt to account for Sharon's moderate mental impairments in this way defies judicial review. Under *Mascio*, the ALJ could not adequately account for Sharon's "moderate limitations in concentration, persistence, and pace" merely by restricting Sharon "to simple, routine, repetitive tasks." 780 F.3d at 638 (noting that "the ability to perform simple tasks differs from the ability to stay on task," and "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace"); *see* Dkt. 19 at 9. So if the ALJ accounted for Sharon's moderate limitations in concentration, persistence, or pace at all, it was by restricting her to working in "a low stress environment[,] with low stress defined as no strict

9

production quotas." But, as noted above, the ALJ did not explain the phrase "no strict production quotas." Thus, it is "difficult, if not impossible," to determine whether the RFC assessment adequately accounted for Sharon's mental difficulties. *Thomas*, 916 F.3d at 312.

Without a clear definition of "strict production quotas," the Court finds that it cannot assess whether the ALJ's RFC determination adequately accounts for Sharon's moderate impairments in concentration, persistence or pace. Thus, it supports Judge Hoppe's conclusion that remand is warranted on this issue. Dkt. 19 at 8–9.

3. **ALJ's Consideration of Medical Evidence of Mental Health Treatment**

In assessing Sharon's RFC, the ALJ was required to follow a two-step analysis when considering her subjective statements about impairments and symptoms. R. 49; *see* 20 C.F.R. § 404.1529. An ALJ must (1) look for medical evidence showing an impairment that could reasonably produce the alleged symptoms and then (2) "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's" ability to perform basic work activities. R. 49. Here, the ALJ found that Sharon's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but he concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." R. 50.

In the R&R, Judge Hoppe determined that the ALJ did not explain how he "weighed significant evidence related to [Sharon's] mental-health treatment" in reaching this conclusion. *Id.* at 9 (quoting *Thomas*, 916 F.3d at 312). The R&R highlights numerous places in the administrative record where the medical opinions of Sharon's treating physicians undermine the ALJ's conclusion that Sharon had "generally normal mental status examinations," R. 50. Dkt. 19 at 9–

10

10. In making his finding, the ALJ focused on Sharon's "intact memory," R. 47, 50, lack of "thought disorder, hallucinations, or delusions," R. 50–51, and presentation as "friendly," "pleasant," or "cooperative," R. 50. Dkt. 19 at 9–10. However, the ALJ did not explain how he reconciled conflicting evidence that showed Sharon "often" had an "angry/hostile" mood, R. 50, 46, and tended to "shut down or lash out" under stress, R. 48. Dkt. 19 at 10. In addition, Judge Hoppe notes that the ALJ did not discuss abnormal findings suggesting that Sharon's mental health conditions limited her ability to work to a greater degree than he found. For example, the ALJ did not address Sharon's treating psychologist's observations that Sharon was "usually depressed or anxious" and sometimes "defensive," "agitated," and "angry," R. 394–97; her treating psychiatrist's opinions that Sharon had "some problems with flexibility" and "trouble adapting to demands of work," R. 544; and an examining psychologist's observations that Sharon "often misperceive[d] events and form[ed] mistaken impressions of people and the significance of their actions," showed "paranoid ideation," and had "deficits in her cognitive function related to correctly receiving [nonverbal] information" that "made it difficult for her to interpret social cues accurately," R. 405. Dkt. 19 at 9–10. The ALJ also did not mention state agency psychologists' medical opinions noting that Sharon could handle only "infrequent" or "gradual" changes in the workplace and "could accept direction and constructive criticism from supervisors" if those interactions were "nonconfrontational." *Id.* at 10–11; R. 120–21, 136–37.

In attempting to justify his decision to give some medical opinions more weight than others, the ALJ repeated several times that these opinions were "consistent with the overall evidence of record," particularly Sharon's "generally normal" or "largely normal" "mental status examinations." R. 52. And in trying to explain his decision to give Sharon's multiple lower Global Assessment of Functioning ("GAF") scores "modest weight" while giving her one higher GAF

score "significant weight," the ALJ stated that the "very low scores [we]re inconsistent with the claimant's generally normal mental status examinations as well as her extensive activities of daily living and work activity" and that the higher score was "more consistent with the mental status examination findings of record and the claimant's activities of daily living." *Id.*

The Commissioner is correct that this case differs from *Thomas*. In *Thomas*, the ALJ endorsed normal mental health findings made by physicians treating the claimant's foot pain while failing to discuss "a substantial portion of the record relating to [the claimant's] treatment by mental health specialists." 916 F.3d at 312; *see* Dkt. 22 at 6. Here, however, the ALJ cited Sharon's mental health treatment records from psychologists and psychiatrists and acknowledged some positive and negative findings. R. 50–51; Dkt. 22 at 6–7. The Commissioner is also correct that the ALJ need not "specifically refer to every piece of evidence in his decision." Dkt. 22 at 7 (quoting *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)). But the Commissioner's assertion that the ALJ's conclusion is supported by substantial evidence is incorrect.

On the one hand, substantial evidence "means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of the ALJ, *Hancock*, 667 F.3d at 472, and must defer to the ALJ's decision where "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson*, 434 F.3d at 653. But on the other hand, "[a]n ALJ has the obligation to consider all relevant medical evidence and cannot simply cherrypick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Lewis*, 858 F.3d at 869. In *Lewis*, the Fourth Circuit reversed and remanded where the ALJ failed to "build an accurate and logical bridge" from

consistent medical opinions from treating physicians about the claimant's debilitating pain and his conclusion that those accounts should not be credited. *Id.* at 866–68. Indeed, "'a necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling,' including 'a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence.'" *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013)). In *Monroe*, the Fourth Circuit reversed and remanded where the ALJ's explanation of the varying degrees of weight he gave to differing medical opinions about the claimant's impairments consisted of "conclusory" assertions that the opinions either were or were not "consistent with" or "supported by" "the objective evidence" or the claimant's "treatment history," without "specify[ing] what 'objective evidence' or what aspects of [the claimant's] 'treatment history' he was referring to." *Id.* at 191 (finding that "the analysis is incomplete and precludes meaningful review").

Here, the ALJ, like the one in *Lewis*, inexplicably gave short shrift to some medical opinions in Sharon's mental health treatment record and failed to adequately explain why he believed some sources more than others. Although he described aspects of medical opinions that supported his conclusion that Sharon had "generally normal" or "mostly normal" mental health examinations, he glossed over other aspects of those same medical opinions that illustrated more serious difficulties, particularly with respect to interpersonal interaction. In addition, as in *Monroe*, the ALJ's repetitive and conclusory statements that medical opinions were or were not "consistent with the overall evidence of record," including Sharon's "generally normal" or "largely normal" "mental status examinations" and "activities of daily living," fail to sufficiently explain how he weighed different medical opinions and resolved conflicting evidence with respect to Sharon's

mental health impairment and functioning. Thus, "the analysis is incomplete and precludes meaningful review." *Id.* To be sure, the ALJ need not discuss every piece of evidence, *Reid*, 769 F.3d at 865, and the ALJ has the authority—and responsibility—to determine the weight to be given to a medical opinion in the record. *See Mastro*, 270 F.3d at 178. But the ALJ must not ignore significant portions of the medical evidence and must sufficiently explain why he credited some medical evaluations of Sharon's mental health but not others.

The Court finds that the ALJ failed to sufficiently explain his weighing and evaluation of mental health evidence in reaching his conclusion about Sharon's ability to function. Thus, it supports Judge Hoppe's conclusion that remand is warranted on this issue. Dkt. 19 at 9–11.

## CONCLUSION

For the foregoing reasons, the Court **ORDERS** that

1. Magistrate Judge Hoppe's R&R is **ADOPTED** in full, Dkt. 19;
2. The Commissioner's objections to the R&R are **OVERRULED**, Dkt. 22;
3. Plaintiff's motion for summary judgment is **GRANTED**, Dkt. 9;
4. The Commissioner's motion for summary judgment is **DENIED**, Dkt. 17; and
5. The Commissioner's final decision is **REVERSED**, and the matter is **REMANDED** until the fourth sentence of 42 U.S.C. § 405(g).

The Clerk of the Court is **DIRECTED** to **DISMISS** this case from the Court's active docket and to send a certified copy of this Memorandum Opinion and Order to all counsel of record and to Magistrate Judge Hoppe.

ENTERED this  27th  day of October 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE